**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION** | |
| and | |
| **STATE OF NORTH DAKOTA,** | |
| Plaintiffs, | |
| v. | No. 1:17-cv-00133-DLH-CSM |
| **SANFORD HEALTH,** | **REDACTED PUBLIC VERSION** |
| **SANFORD BISMARCK,** | |
| and | |
| **MID DAKOTA CLINIC, P.C.,** | |
| Defendants. | |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION PURSUANT TO**
**SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT**

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission") and the State of

North Dakota, by their designated attorneys, petition the Court, pursuant to Section 13(b) of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton

Act, 15 U.S.C. § 26, for a temporary restraining order and preliminary injunction enjoining

Defendant Sanford Health, Defendant Sanford Bismarck (together with Sanford Health,

"Sanford"), and Defendant Mid Dakota Clinic, P.C. ("MDC"), including their agents, divisions,

parents, subsidiaries, affiliates, partnerships, or joint ventures, from consummating an acquisition

or consolidation.  The proposed acquisition or consolidation is pursuant to a Term Sheet, dated

August 22, 2016, whereby Sanford plans to purchase MDC's assets through two separate transactions (herein referred to collectively as the "Transaction")—one in which Sanford will purchase the stock and clinic assets of MDC's professional corporation, and another in which Sanford will purchase the real estate and other assets owned by the Mid Dakota Medical Building Partnership that are leased by MDC.  Absent this Court's action, Defendants will be free to complete the Transaction after 11:59 pm EST on June 26, 2017.

Plaintiffs require the aid of this Court to maintain the *status quo* and prevent interim harm to competition during the pendency of an administrative trial on the merits.  The Commission has already initiated that administrative trial, pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on June 21, 2017.  Pursuant to FTC regulations, the administrative trial on the merits will begin five months from the date of that filing (i.e., on November 28, 2017).  The administrative trial will determine the legality of the Transaction and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Transaction.

## I.

## NATURE OF THE CASE

1.     Sanford and MDC are the two largest providers of adult primary care physician services, pediatric services, obstetrics and gynecology services, and general surgery physician services in Bismarck and Mandan, North Dakota.  The proposed Transaction would create by far the largest—and in one case, the only—group of physicians offering these services in Bismarck and Mandan.

2.      The proposed Transaction will substantially lessen competition and cause

significant harm to consumers.  If Defendants consummate the Transaction, healthcare costs will

rise, and the incentive to increase service offerings and improve the quality of healthcare will

diminish.

3.      Sanford and MDC are each other's closest competitor in the Bismarck-Mandan

area.  Sanford describes MDC as its "major competitor for primary care" and "main clinical

competitor" in the Bismarck-Mandan area.  MDC views Sanford as a significant competitor that

threatens its market share in the Bismarck-Mandan area, describing it as "a demon to deal with

competitively" and observing that "combining with them would put us in the dominant health

care system for quite a while."  Defendants also directly respond to one another by purchasing

new equipment, updating technology, expanding services, recruiting high-quality physicians, and

providing patients with convenient and accessible physician and surgical services.

4.      The Transaction will substantially lessen competition in the markets for adult

primary care physician services ("adult PCP services"), pediatric physician services ("pediatric

services"), obstetrics and gynecology physician services ("OB/GYN services"), and general

surgery physician services sold and provided to commercial payers and their insured members

(together, the "relevant services").  The relevant geographic market in which to analyze the

effects of the Transaction is an area no broader than the four-county Bismarck, ND Metropolitan

Statistical Area (the "Bismarck-Mandan area").

5.      Defendants are the two largest providers of the relevant services in the Bismarck-

Mandan area.  Post-Transaction, Defendants would control over 75% of the market for adult PCP

services, over 80% of the market for pediatric services, over 85% of the market for OB/GYN

services, and 100% of the market for general surgery physician services, by physician headcount,

in the Bismarck-Mandan area.  The Transaction significantly increases concentration in already highly concentrated markets, making it presumptively unlawful under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines").

6.     Today, Sanford and MDC compete for inclusion in commercial payers' provider networks.  Without either of these physician groups, it would be very difficult for commercial payers to market a health plan provider network to employers with employees living in the Bismarck-Mandan area.  Competition between Sanford and MDC results in lower prices, higher quality, and greater services offerings.

7.     By eliminating competition between Sanford and MDC, the Transaction is likely to increase Defendants' bargaining leverage with commercial payers, and enhance Defendants' ability to negotiate more favorable reimbursement terms, including reimbursement rates (i.e., prices).  Faced with higher rates and other less favorable terms, commercial payers will have to pass on those higher healthcare costs to employers and their employees in the form of increased premiums and, potentially, higher co-pays, deductibles, or other out-of-pocket expenses.  The merged firm will also have a diminished incentive to expand services, acquire new technology, and improve quality and access for patients in the Bismarck-Mandan area.

8.     Entry or expansion by other providers into the relevant services will not likely be timely or sufficient to offset the competitive harm that will likely result from the Transaction.  It will take ███████████ for CHI St. Alexius Health ("CHI St. Alexius")—a vertically integrated healthcare provider in Bismarck and Mandan with only minimal service line overlap with MDC—to enter or reposition sufficient to offset the potential competitive harm from the Transaction.  Smaller, independent physician groups cannot recruit and accommodate new physicians on a necessary scale to counteract or constrain post-Transaction price increases or

quality and service decreases, and new independent physicians or large healthcare organizations from outside the Bismarck-Mandan area are unlikely to enter *de novo*.

9.     Defendants' speculative efficiency and quality-of-care claims are unsubstantiated, not merger-specific, and not cognizable.  Even assuming Defendants' purported efficiencies were cognizable, they are far outweighed by the Transaction's potential harm and would not justify the Transaction.

10.     A temporary restraining order enjoining the Transaction is necessary to preserve the *status quo* and allow the Court to grant full and effective relief after considering the Commission and Attorney General's application for a preliminary injunction.  Preliminary injunctive relief restraining Defendants from proceeding with their Transaction is necessary to prevent interim harm to competition during the Commission's ongoing administrative proceeding.  Absent preliminary relief, Defendants can close the Transaction and combine their operations, and the Commission and Attorney General's ability to fashion effective relief would be significantly impaired, or potentially precluded, if the Transaction were found to be unlawful after a full trial on the merits and any subsequent appeals.

## II.

## BACKGROUND

### A.

### Jurisdiction and Venue

11.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act

of Congress to bring this action. Sanford and MDC, and their relevant operating entities and subsidiaries, are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

12.     Sanford and MDC transact business in the District of North Dakota and are subject to personal jurisdiction therein. Venue therefore is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

13.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

(b)     Whenever the Commission has reason to believe –

> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public – the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . .

14.     In conjunction with the Commission, the State of North Dakota brings this action for a preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Sanford and MDC from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, pending the Commission's administrative proceeding. The State of North Dakota has the requisite standing to bring this action because the Transaction would cause antitrust injury in North

Dakota for adult PCP services, pediatric services, OB/GYN services, and general surgery physician services.

## B.

## The Parties

15.     Plaintiff, the Commission, is an administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, District of Columbia 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

16.     Plaintiff, the State of North Dakota, is a sovereign state of the United States.  This action is brought by and through its Attorney General, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of his state pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26; North Dakota Century Code §§ 32-06-02 and 51-15-07; and North Dakota Century Code §§ 51-08.1-07 and 51-08.1-08 of the Uniform State Antitrust Act. The Office of the Attorney General of the State of North Dakota has its principal offices at 600 East Boulevard Avenue, Bismarck, North Dakota 58505.

17.     Defendant Sanford Bismarck is a North Dakota not-for-profit corporation and vertically integrated healthcare delivery system headquartered at 300 N. 7th Street, Bismarck, North Dakota 58501.  Sanford Bismarck is a wholly-owned subsidiary of Defendant Sanford Health, a not-for-profit corporation.  Together and with other controlled corporations, Sanford Bismarck and Sanford Health constitute and operate Sanford.  In the cities of Bismarck and Mandan, North Dakota, Sanford operates Sanford Bismarck Medical Center, a 217-bed general

acute care hospital and Level II trauma center offering inpatient and outpatient services; eight clinics that provide primary care services; and a number of specialty clinics.  Sanford employs approximately 160 primary care and specialist physicians who work in Bismarck or Mandan, including 36 adult PCPs, 4 pediatricians, 8 OB/GYNs, and 4 general surgeons.  Sanford also employs approximately 100 advanced practice providers ("APPs").  Sanford is the largest private employer in the Bismarck-Mandan area and plans to recruit an additional ▮ physicians over the next ▮ years, including ▮ to work in its clinic and facility locations in Bismarck and Mandan.  Sanford Health, its Sanford Bismarck subsidiary, and other subsidiaries generated ▮▮▮▮ in revenue for the fiscal year ending on June 30, 2016.

18.     Sanford sells health insurance in four states, including North Dakota, under the operating name Sanford Health Plan.  Sanford Health Plan has approximately ▮▮ covered lives in North Dakota.

19.     Defendant MDC is a for-profit, physician-owned professional corporation under North Dakota law that is headquartered at 401 N. 9th Street, Bismarck, North Dakota 58501. MDC is a multispecialty medical practice that employs 61 physicians who provide primary care and specialty practice medical services in Bismarck, including 23 adult PCPs, 6 pediatricians, 8 OB/GYNs, and 6 general surgeons.  MDC also employs 19 APPs.  Additionally, MDC operates six clinics, a Center for Women, and an ambulatory surgery center ("ASC") in Bismarck.  MDC is the twelfth-largest private employer in Bismarck.  For the fiscal year ending on December 31, 2015, MDC generated ▮▮▮▮ in revenue.

20.     MDC's 53 physician shareholders control Mid Dakota Medical Building Partnership, a partnership under North Dakota law that owns real estate and other assets, including two medical office buildings and a warehouse located in Bismarck.  For the fiscal year

ending on December 31, 2015, Mid Dakota Medical Building Partnership generated over ███

███ in income for its physician shareholders.

21.     MDC holds a non-transferable 25% interest in PrimeCare Health Group

("PrimeCare"), a physician-hospital organization that contracts with commercial payers on

behalf of MDC's physicians.  CHI St. Alexius holds the remaining 75% interest in PrimeCare.

## C.

### The Transaction and the Commission and Attorney General's Responses

22.     In early 2015, MDC initiated discussions with Sanford regarding a potential

affiliation.  MDC also discussed a potential affiliation with CHI St. Alexius in 2015 and early

2016.  In spring 2016, MDC's affiliation discussions with CHI St. Alexius terminated, and

Defendants' affiliation discussions became exclusive.  On August 22, 2016, Defendants signed a

Term Sheet, according to which Sanford will purchase MDC's practice assets, including its

clinics, ASC, laboratory, and diagnostic imaging equipment, as well as the real estate and other

assets owned by the Mid Dakota Medical Building Partnership that are leased by MDC.

Defendants have finalized a Stock Purchase Agreement for the sale of MDC's practice assets at

██████████████████████████████████████████████████, and a Real Estate

and Asset Purchase Agreement for the sale of the Mid Dakota Medical Building Partnership

assets at ██████████████████████████████████████████████

███████  The Transaction value includes ████████████████████████████

████████████████████████████████████████████████

█████████  As part of the Transaction, ████████████████████████████

████████████████████████████████████  Pursuant to a timing

agreement entered into between Defendants and Commission staff, absent this Court's action, Defendants would be free to close the Transaction after 11:59 pm EST on June 26, 2017.

23.     Following an investigation, the Commission, on June 21, 2017, and by a unanimous vote, found reason to believe that the Transaction would violate Section 7 of the Clayton Act by substantially lessening competition.  That same day, the Commission initiated an administrative proceeding on the antitrust merits of the Transaction before an Administrative Law Judge, and a merits trial will begin on November 28, 2017.  The administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony.  The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

24.     On June 21, 2017, the Commission also authorized its staff to pursue this federal court proceeding to obtain preliminary injunctive relief under Section 13(b) of the FTC Act.  In doing so, the Commission has determined that it has reason to believe the Transaction would violate the Clayton Act and the FTC Act by substantially lessening competition.

25.     Following an investigation, the Attorney General determined that he has a reasonable basis to believe that the Transaction would violate Section 7 of the Clayton Act and North Dakota Century Code § 51-08.1, the Uniform State Antitrust Act, by substantially lessening competition.

## III.

## THE RELEVANT SERVICE MARKETS

26.     The Transaction threatens substantial harm to competition in four relevant service markets: (1) adult PCP services; (2) pediatric services; (3) OB/GYN services; and (4) general surgery physician services.  The appropriate product market in which to analyze the Transaction is the set of services for which a hypothetical monopolist could profitably impose a small but significant and non-transitory increase in price ("SSNIP").  This group of services constitutes an appropriate market when payers would accept a SSNIP rather than market a network that omitted the services of the hypothetical monopolist.

## A.

## Adult PCP Services Market

27.     The Transaction threatens substantial competitive harm in the market for adult PCP services sold and provided to commercial payers and their insured members.  This market encompasses services provided to commercially insured patients age 18 and over by physicians who are board-certified in internal medicine, family medicine, and general practice.  Adult PCP services typically include routine medical services in an outpatient or office setting, such as physical exams, basic medical procedures, treatments of common illnesses and injuries, and long-term management of chronic conditions such as diabetes and hypertension.

28.     The adult PCP services market excludes obstetricians and gynecologists ("OB/GYNs") because for many health plan enrollees, including all males, services offered by OB/GYN physicians are not viable substitutes for adult PCP services.  The market also excludes services provided by pediatricians because pediatricians typically only treat patients under age 18, and thus do not compete with PCPs that treat adults.  A payer would accept a SSNIP rather

11

than market a network that omits adult PCP services even if that network also includes OB/GYN services and pediatric services.

## B.

### Pediatric Services Market

29.     The Transaction also threatens substantial competitive harm in the market for pediatric physician services sold and provided to commercial payers and their insured members. This market includes primary care services provided by pediatricians to children under the age of 18. Pediatricians receive additional training to treat medical conditions affecting pediatric patients, and physicians trained for other specialties generally do not have this required expertise and thus do not compete with pediatricians. A payer would accept a SSNIP rather than market a network that omits pediatricians.

## C.

### OB/GYN Services Market

30.     The Transaction also threatens substantial competitive harm in the market for OB/GYN physician services sold and provided to commercial payers and their insured female members. The market for OB/GYN services includes services provided by OB/GYN physicians related to women's reproductive health, pregnancy, and childbirth. The OB/GYN services market excludes physicians who lack additional training in these services because the services provided by other types of physicians are not viable substitutes for OB/GYN services. A payer would accept a SSNIP rather than market a network that omits OB/GYN services.

### D.

### General Surgery Physician Services Market

31.     The Transaction also threatens substantial competitive harm in the market for general surgery physician services sold and provided to commercial payers and their insured members.  The general surgery physician services market encompasses services offered by physicians who are board-certified exclusively in general surgery.  General surgeons typically perform basic surgical procedures including abdominal surgeries, hernia repair surgeries, gallbladder surgeries, and appendectomies.  Specialty surgeons who receive additional training and certification in particular types of procedures beyond the scope of general surgery training do not perform the same set of services as surgeons who are board-certified exclusively in general surgery, and therefore are excluded from the market.  A payer would accept a SSNIP rather than market a network that omits general surgery physician services.

### IV.

### THE RELEVANT GEOGRAPHIC MARKET

32.     The relevant geographic market in which to analyze the effects of the Transaction for each relevant service market is an area no larger than the four-county Bismarck, ND Metropolitan Statistical Area, which includes Burleigh, Morton, Oliver, and Sioux counties.  The Bismarck-Mandan area covers a population of more than 125,000 people and includes the cities of Bismarck and Mandan, as well as rural areas and farming communities extending 40 to 50 miles outside of the two cities in every direction.

33.     The appropriate geographic market in which to analyze the Transaction is the area where a hypothetical monopolist of the relevant services could profitably impose a SSNIP.  If a

hypothetical monopolist could impose a SSNIP, the boundaries of that geographic area are an appropriate geographic market.

34.     Bismarck-Mandan area residents strongly prefer to obtain the relevant services close to where they live.  Indeed, it would be very difficult for a payer to market successfully to employers with employees living in the Bismarck-Mandan area a health plan that did not include PCPs, pediatricians, OB/GYNs, or general surgeons located within the Bismarck-Mandan area.  A hypothetical monopolist that controlled all providers of any relevant service in the Bismarck-Mandan area could profitably impose a SSNIP on payers.  The Bismarck-Mandan area is therefore a properly defined geographic market.

35.     The Bismarck-Mandan area is the main area of competition between Sanford and MDC in each relevant service market.  It also comprises the population center from where Defendants draw a significant portion of their patients.  Approximately 95% of patients living in the Bismarck-Mandan area stay within the Bismarck-Mandan area for the relevant services.  Quantitative and qualitative evidence, including Defendants' own executives and ordinary course documents, confirm that the Bismarck-Mandan area is the relevant geographic market in which to analyze the effects of the Transaction.

## V.

## MARKET STRUCTURE AND THE TRANSACTION'S PRESUMPTIVE ILLEGALITY

36.     Sanford and MDC are the two largest providers of each of the relevant services in the Bismarck-Mandan area.

37.     Under relevant case law and the Horizontal Merger Guidelines, the Transaction is presumptively unlawful in all four relevant service markets.  Based on physician headcount in the Bismarck-Mandan area, post-Transaction, Defendants will control 77% of the adult PCP

services market, 83% of the pediatric services market, 88% of the OB/GYN services market, and 100% of the general surgery physician services market.

38.     The courts and antitrust agencies commonly use the Herfindahl-Hirschman Index ("HHI") to measure market concentration.  The HHI is calculated by totaling the squares of the market shares of every firm in the relevant market.  Under the Merger Guidelines, a market with an HHI that exceeds 2,500 points is considered highly concentrated.  A merger or acquisition is presumed likely to create or enhance market power—and is presumptively illegal—when the post-acquisition HHI exceeds 2,500 points and the merger or acquisition increases the HHI by more than 200 points.  Here, the market concentration levels far exceed these thresholds.  As measured by physician headcount in the Bismarck-Mandan area, each of the relevant service markets is already highly concentrated today, and the Transaction further concentrates these markets.  The following tables summarize the market shares and HHI figures for each relevant service market.

| ADULT PCP SERVICES | | | |
|---|---|---|---|
| Preliminary Market Shares by Physician Headcount for Providers Within Bismarck-Mandan Area | | | |
| Provider | Adult PCP Headcount | Market Share | |
| | | Pre-Transaction | Post-Transaction |
| **Sanford Bismarck** | **36** | **47%** | |
| **Mid Dakota Clinic** | **23** | **30%** | **77%** |
| CHI St. Alexius Health | 6 | 8% | 8% |
| UND Center for Family Medicine | 6 | 8% | 8% |
| Independent Doctors, P.C. | 3 | 4% | 4% |
| Baker Family Medicine | 1 | 1% | 1% |
| Glen Ullin Family Clinic | 1 | 1% | 1% |
| Jeffrey Smith, MD | 1 | 1% | 1% |
| **HHI** | | 3,220 | 6,013 |
| **Change in HHI** | | 2,793 | |

| PEDIATRIC SERVICES | | | |
|---|---|---|---|
| **Preliminary Market Shares by Physician Headcount for Providers Within Bismarck-Mandan Area** | | | |
| **Provider** | **Pediatrician Headcount** | **Market Share** | |
| | | **Pre-Transaction** | **Post-Transaction** |
| **Sanford Bismarck** | **4** | **33%** | |
| **Mid Dakota Clinic** | **6** | **50%** | **83%** |
| Independent Doctors, P.C. | 1 | 8% | 8% |
| UND Center for Family Medicine | 1 | 8% | 8% |
| **HHI** | | **3,750** | **7,083** |
| **Change in HHI** | | **3,333** | |

| OB/GYN SERVICES | | | | |
|---|---|---|---|---|
| **Preliminary Market Shares by Physician Headcount for Providers Within Bismarck-Mandan Area** | | | | |
| **Provider** | **OB/GYN Headcount** | | **Market Share** | |
| | **Pre-Transaction** | **Post-Transaction** | **Pre-Transaction** | **Post-Transaction** |
| **Sanford Bismarck** | **8** | | **47%** | |
| **Mid Dakota Clinic** | **8** | **15** | **47%** | **88%** |
| UND Center for Family Medicine | 1 | 1 | 6% | 6% |
| CHI St. Alexius Health[*] | 0 | 1 | 0% | 6% |
| **HHI** | | | **4,464** | **7,855** |
| **Change in HHI** | | | **3,391** | |

| GENERAL SURGERY PHYSICIAN SERVICES | | | |
|---|---|---|---|
| **Preliminary Market Shares by Physician Headcount for Providers Within Bismarck-Mandan Area** | | | |
| **Provider** | **General Surgeon Headcount** | **Market Share** | |
| | | **Pre-Transaction** | **Post-Transaction** |
| **Sanford Bismarck** | **4** | **40%** | |
| **Mid Dakota Clinic** | **6** | **60%** | **100%** |
| **HHI** | | **5,200** | **10,000** |
| **Change in HHI** | | **4,800** | |

---

[*] CHI St. Alexius's post-Transaction headcount and market share consist of Dr. Jan Bury, a current MDC OB/GYN who is moving to CHI St. Alexius post-Transaction.  She is counted as an MDC physician for purposes of calculating the pre-Transaction HHI, and counted as a CHI St. Alexius physician for purposes of calculating the post-Transaction HHI.

# VI.

## ANTICOMPETITIVE EFFECTS

### A.

### Competition Among Healthcare Providers Benefits Consumers

39.     Competition between healthcare providers occurs in two distinct but related stages.  First, providers compete for inclusion in commercial payers' health plan provider networks.  Second, in-network providers compete to attract patients, including commercial payers' health plan members.

40.     In the first stage of provider competition, providers compete to be included in commercial payers' health plan provider networks.  To become an in-network provider, a provider negotiates with a commercial payer and, if mutually agreeable terms can be reached, enters into a contract.  The financial terms under which a provider is reimbursed for services rendered to a health plan's members are a central component of those negotiations, regardless of whether reimbursements are based on fee-for-service contracts, risk-based contracts, or other types of contracts.

41.     In-network status benefits a provider by giving it preferential access to the health plan's members.  Health plan members typically pay far less to access in-network providers than those out-of-network.  Thus, all else being equal, an in-network provider will attract more patients from a particular health plan than an out-of-network one.  This dynamic motivates providers to offer lower rates and other more favorable terms to commercial payers to win inclusion in their networks.

42.     From the payers' perspective, having providers in-network is beneficial because it enables the payer to create a health plan provider network in a particular geographic area that is attractive to current and prospective members, typically local employers and their employees.

43.     Under a fee-for-service payment model, a provider receives payment (i.e., reimbursement) for the services it provides to a commercial payer's health plan members. Such payment is typically on a per-service, per-diem, or discount-off-charges method. Under a full risk-based payment model, a provider is reimbursed a fixed payment for all services provided to a particular member. As a result, the provider has an incentive to reduce overall utilization of services by patients. Regardless of whether a contract's reimbursement method is based on fee-for-service terms, risk-based terms, or some combination of both, relative bargaining leverage plays a key role in negotiations between commercial payers and providers.

44.     A critical determinant of the relative bargaining positions of a provider and a commercial payer during contract negotiations is whether other, nearby comparable providers are available to the commercial payer and its health plan members as alternatives in the event of a negotiating impasse. Alternative providers limit a provider's bargaining leverage and thus constrain its ability to obtain more favorable reimbursement terms from commercial payers. The more attractive these alternative providers are to a commercial payer's health plan members in a local area, the greater the constraint on that provider's bargaining leverage. Where there are few or no meaningful alternatives, a provider will have greater bargaining leverage to demand and obtain higher reimbursement rates and other more favorable reimbursement terms.

45.     A merger between providers that are close substitutes in the eyes of commercial payers and their health plan members therefore tends to increase the merged entity's bargaining leverage. Such mergers lead to higher reimbursement rates by eliminating an available

alternative for commercial payers.  This increase in leverage is greater when the merging providers are closer substitutes for (and competitors to) each other.  This is true even where other factors, such as a payer's leverage as a result of having high market share, may impact the pre-merger bargaining dynamic.  Preexisting leverage for the payer does not eliminate the concern about an increase in the post-merger bargaining leverage of the merged entity.

46.     Changes in the reimbursement terms negotiated between a provider and a commercial payer, including increases in reimbursement rates, significantly impact the commercial payer's health plan members.  "Self-insured" employers rely on a commercial payer for access to its health plan provider network and negotiated rates, but these employers pay the cost of their employees' healthcare claims directly and thus bear the full and immediate burden of any rate increase in the healthcare services used by their employees.  Employees may bear some portion of the cost through premiums, co-pays, and deductibles.  "Fully-insured" employers pay premiums to commercial payers—and employees pay premiums, co-pays, and deductibles—in exchange for the commercial payer assuming financial responsibility for paying provider costs generated by the employees' use of provider services.  When provider rates increase, commercial payers pass on these increases to their fully-insured customers in the form of higher premiums, co-pays, and deductibles.

47.     In the second stage of provider competition, providers compete to attract patients to their facilities.  Because health plan members often face similar out-of-pocket costs for in-network providers, providers in the same network compete to attract patients on non-price features—that is, by offering better quality of care, amenities, convenience, and patient satisfaction than their competitors.  Providers also compete on these non-price dimensions to attract patients covered by Medicare and Medicaid, and other patients without commercial

insurance.  A merger of competing providers eliminates that non-price competition and reduces the merged entity's incentive to improve and maintain quality.  Providers also compete on price terms in this second stage of competition in circumstances when patients pay the full cost of the procedure out of pocket, regardless of whether they are commercially insured.

**B.**

**The Transaction Would Eliminate Beneficial Head-to-Head Competition and Increase Bargaining Leverage**

48.     Sanford and MDC are each other's closest competitor in the Bismarck-Mandan area for each of the relevant services.  Sanford's ordinary course documents reflect the close competition between the Defendants.  Sanford believes MDC is its "main clinical competitor" and "major competitor for primary care" in the Bismarck-Mandan area and identifies MDC as its only competitor for pediatric services in the Bismarck-Mandan area.  Sanford also considers MDC's OB/GYN department to be Sanford's "top competitor" delivering babies in the Bismarck-Mandan area and describes MDC's general surgeons as Sanford's "primary competition in Bismarck" for bariatric procedures.  Sanford's internal marketing and market research documents closely monitor MDC service offerings and routinely compare MDC's service offerings to its own, particularly in women's services and general surgery, in an effort to assess Sanford's "competitive advantage" over MDC.

49.     Similarly, MDC considers Sanford to be a significant competitor and a threat to its market share in the relevant service markets.  MDC expressed concern that Sanford "put a large target on [MDC's] finances and market share" and emphasized a need to "work on retaining the market share" in the face of Sanford "making some inroads into OB."  Additionally, the results of a 2015 MDC strategy assessment conducted by MDC's marketing consulting focused on Sanford as MDC's closest clinical competitor in the Bismarck-Mandan area.  MDC's

Chief Financial Officer observed that "Sanford is going to be a demon to deal with competitively. . . . Combining with them would put us in the dominant health care system for quite a while."

50.     Defendants track and respond to each other's marketing campaigns and advertising spending, which neither Defendant does with respect to other providers.  Sanford and MDC are also each other's closest competitor to recruit adult PCPs, pediatricians, OB/GYNs, and general surgeons, and are the two practices in the Bismarck-Mandan area that graduating residents and physicians in these service lines relocating to the Bismarck-Mandan area look to for employment.  Because Sanford and MDC are close substitutes for each of the relevant services, the Transaction would eliminate significant head-to-head competition between the Defendants.

51.     Diversion analysis, a standard economic tool that uses data on where patients receive healthcare services to determine the extent to which providers are substitutes, confirms that Sanford and MDC are close competitors.  Preliminary diversion analysis shows that if all Sanford physicians providing adult PCP services were not available to Bismarck-Mandan area patients, approximately 77% of their patients would seek care at MDC.  Correspondingly, if all MDC physicians providing adult PCP services were not available to Bismarck-Mandan area patients, approximately 82% of their patients would seek care at Sanford.  In other words, each is by far the next-best alternative for patients of the other.  Diversions for adult PCP services and other relevant services are shown in the table below:

| Service | Diversion from Sanford to MDC | Diversion from MDC to Sanford |
|---|---|---|
| Adult PCP | 77% | 82% |
| Pediatric | 90% | 94% |
| OB/GYN | 77% | 70% |
| General Surgery | 96% | 98% |

52.     Offering provider coverage in the Bismarck-Mandan area is essential for a commercial payer to market a health plan provider network successfully to employers with employees in the Bismarck-Mandan area.  At present, Sanford and MDC serve as the key providers of the relevant services for consumers living in the Bismarck-Mandan area, and either one can support a marketable health plan provider network.  For example, Sanford offers its employees a group health plan that excludes MDC physicians as in-network providers, and MDC offers its employees a group health plan that excludes Sanford physicians as in-network providers.  This substitutability leads to lower prices.  When developing a provider network for the North Dakota Public Employees Retirement System ("NDPERS"), Sanford Health Plan ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████  Commercial payers and employers do not view other providers in the Bismarck-Mandan area as adequate substitutes for Sanford or MDC. Consistent with that view, Bismarck-Mandan area residents strongly prefer that their health plan networks include at least one of the Defendants.

53.     By combining the two largest providers of the relevant services in the Bismarck-Mandan area, the Transaction would increase Defendants' bargaining leverage in contract negotiations with commercial payers because employers in the Bismarck-Mandan area would have little, if any, interest in a health plan network that excluded the combined system. Defendants' increased bargaining leverage would enhance their ability to negotiate higher

reimbursement rates and more favorable reimbursement terms in payer contracts.  Commercial payers would have little choice but to accept the reimbursement terms demanded by the merged system or exclude the merged system and risk having their network fail.

54.     Today, when constructing provider networks for Bismarck-Mandan area employers, commercial payers treat Sanford and MDC (as part of PrimeCare) as substitutes— some include Sanford while excluding MDC and PrimeCare, and others exclude Sanford while including MDC and PrimeCare.  If the merger is consummated, virtually every provider network marketed to consumers in the Bismarck-Mandan area will need to include the combined entity.

## C.

### The Transaction Would Eliminate Vital Quality and Service Competition

55.     Competition drives providers to invest in quality initiatives and new technologies to differentiate themselves from competitors.  Sanford and MDC compete with one another across various non-price dimensions, which has provided patients in the Bismarck-Mandan area with higher quality care and more extensive healthcare service offerings.  Sanford and MDC have substantially invested in acquiring new technology, expanding their services and facilities, and improving patient access to compete against one another.  The Transaction would eliminate this competition.

56.     Sanford and MDC have invested in new technology to attract patients.  In 2014, Sanford acquired 3D mammography technology, a state-of-the art technology that provides breast tissue imaging superior to the existing 2D technology.  Sanford's capital expense and marketing documents explicitly noted the need to acquire the technology to compete with MDC. MDC subsequently acquired the same 3D mammography technology, and "put a million dollars into 3D [mammography technology] . . . [b]ecause [patients] were walking over to Sanford."

Since acquiring the technology, Defendants have continued to compete for 3D mammography patients along several dimensions, including price, access, and breast care services.  Similarly, Sanford invested in a tower-free hysteroscopy system to transition certain gynecological procedures from an operating room to a clinical setting.  Sanford made this investment to remain competitive with MDC, which offered these procedures in an office setting.  Sanford also promotes its use of the da Vinci robotic surgery system for gynecological surgeries as a differentiator between Sanford and MDC's OB/GYN departments, and MDC acknowledged that Sanford's adoption of this technology attracted patients from MDC to Sanford.  Ultimately, MDC encouraged CHI St. Alexius Medical Center, the only other acute care hospital in Bismarck apart from Sanford Bismarck Medical Center, to invest in the robot technology and two MDC OB/GYN physicians trained to use the robot in order to compete with Sanford's OB/GYNs.

57.     Sanford and MDC have also improved patient access and convenience options in order to attract patients.  Both Defendants operate walk-in clinics to provide patients with convenient options for acute care episodes and utilize the clinics as a way to attract and retain patients.  MDC opened its Today Clinic specifically "to answer [Sanford]'s walk-ins; to increase [MDC's] market share and to provide [patient] access."  Both Defendants post wait times on their respective websites as a transparent display of the convenience offered by their walk-in clinics.  MDC has observed that "Sanford consistently promotes their SameDay [program]" and expressed a desire to promote its own program to attract patients.  Similarly, both Defendants offer sports physicals for school-aged children in their walk-in clinics as a convenient and less expensive alternative to comprehensive child wellness/preventative exams.  MDC specifically monitors Sanford's sports physical offerings when developing its own sports physical policy.  In

June 2016, for example, MDC matched Sanford's price for sports physicals.  To attract patients and gain a competitive edge over Sanford, MDC also offers services and amenities not available at Sanford, such as MDC's Center for Women, which provides women patients access to multiple services in one location, and a comprehensive breast program with the only breast fellowship-trained radiologist in North Dakota, who coordinates patient care with other specialists such as surgeons and oncologists.

58.     Patients benefit from this direct competition in the quality of care and services offered to them by Defendants.  Because the merged entity will control the majority of the relevant services in the Bismarck-Mandan area, it will face limited outside competition for patients seeking such services.  Thus, the Transaction will dampen the merged firm's incentive to compete on quality of care and service offerings, to the detriment of all patients who use these providers, including commercially insured, Medicare, Medicaid, and self-pay patients.  As one longtime MDC physician put it:

> competition is good and maybe no more important place than in health care, that it keeps us all striving to be better to make the best possible scenario for the patient and not settle for mediocre when that would be easier if you weren't competing with someone. . . . [W]hen you have competition it makes you step up and try to be better and provide excellent quality without just settling for average, which you can get away with when there is no one to compete with. . . . I don't feel like I want to drop to a mediocre standard of care, after working my whole life just to build a good reputation, I don't want to be just good enough.  I want to be good and competitive.  And I think that monopoly in health care is not a good thing.

## VII.

## ENTRY BARRIERS

59.     Entry by new market participants into the relevant service markets in the Bismarck-Mandan area is unlikely to occur in a timely or sufficient manner to deter or counteract the likely anticompetitive effects of the Transaction.  Repositioning or expansion by current

25

market participants is also unlikely to offset fully the Transaction's likely harm to competition for the relevant services in the Bismarck-Mandan area.

**A.**

**Adult PCP and Pediatric Services Entry Will Not Be Timely or Sufficient**

60.     Existing adult PCP and pediatric practices in the Bismarck-Mandan area are unlikely to expand sufficiently and in a timely manner to offset the anticompetitive effects of the Transaction.  The Bismarck-Mandan area's geographic location, including its cold climate and distance from larger metropolitan areas, makes it difficult for an existing competitor to attract and retain physicians, including adult PCPs and pediatricians, from outside of the area.  Even if an existing competitor successfully recruited adult PCPs and pediatricians, it would be challenging for it to attract the substantial number of patients in the Bismarck-Mandan area needed to be a financially viable competitor.  It would take ███████████ for CHI St. Alexius, the only remaining market participant positioned to enter or reposition in the Bismarck-Mandan area, to hire enough physicians, open adequate clinic space, and establish a presence in the area sufficient to replace the adult PCP and pediatric services offered by MDC.  The other existing adult PCP and pediatric practices in the Bismarck-Mandan area lack the resources or ability to expand to the magnitude where they could counteract or constrain the anticompetitive effects of the Transaction.

61.     New entry by independent physicians into the adult PCP or pediatric services markets in the Bismarck-Mandan area is also unlikely because of the significant financial challenges and risk involved in establishing an independent adult PCP or pediatric practice in the Bismarck-Mandan area, including renting or buying office space, renting or purchasing medical and office equipment, hiring administrative staff, investing in an electronic medical records

26

system, and purchasing malpractice insurance.  A local labor shortage in the Bismarck-Mandan area makes starting an independent adult PCP or pediatric practice even more challenging. Moreover, new physicians finishing their residency programs often have substantial debt and lack the financial resources and experience to open an independent practice.  After opening an office, it likely would take each adult PCP or pediatrician new to the Bismarck-Mandan area two years or longer to establish a patient base, and substantial time and money for a practice to become self-sustaining and a meaningful competitor, posing additional hurdles to new entrants.

**B.**

**OB/GYN Services Entry Will Not Be Timely or Sufficient**

62.     New entry or expansion into the OB/GYN services market in the Bismarck-Mandan area will not be timely or sufficient to offset the Transaction's competitive harm.  In addition to the financial and practical challenges that adult PCPs and pediatricians face in starting an independent practice, OB/GYNs need access to a hospital in order to provide the full scope of OB/GYN services, and must participate in or provide for call coverage for their patients in the hospital.  A solo OB/GYN would have to be on call all the time, which, if even feasible, would likely lower the quality of care.  To have a reasonable call rotation, a practice needs a minimum of four to five OB/GYNs.  It would take ███████████ for CHI St. Alexius, the only remaining market participant positioned to enter or reposition in the Bismarck-Mandan area, to recruit five OB/GYNs to a new practice and open an OB/GYN clinic in the Bismarck-Mandan area, and up to another two years for each new OB/GYN to build a patient base.

## C.

### General Surgery Physician Services Entry Will Not Be Timely or Sufficient

63.     Entry or expansion into the general surgery physician services market in the Bismarck-Mandan area is unlikely to be timely and sufficient to offset any competitive harm that results from the Transaction.  Sanford and MDC employ the only general surgeons in the Bismarck-Mandan area.  In addition to the challenges that adult PCPs, pediatricians, and OB/GYNs face starting a practice in the Bismarck-Mandan area, general surgeons need a source of patient referrals.  An independent general surgeon in the Bismarck-Mandan area would be unlikely to receive referrals because PCPs and other physicians are likely to refer patients to affiliated general surgeons.  As with OB/GYNs, call requirements for general surgeons make it unlikely that a general surgeon would operate a solo practice and difficult for a hospital or physician group to recruit a single general surgeon to start a general surgery group.  A general surgery physician practice needs a minimum of four to five general surgeons to provide call coverage, and it would take ████████████████████ for CHI St. Alexius, the only remaining market participant positioned to enter or reposition in the Bismarck-Mandan area, to recruit a practice of five general surgeons.

## VIII.

### EFFICIENCIES

64.     Defendants' claimed efficiencies do not outweigh the Transaction's likely harm to competition.  The purported benefits would not enhance competition for the relevant services and fall far short of the cognizable efficiencies needed to outweigh the Transaction's likely significant harm to competition in the Bismarck-Mandan area.

65.     Defendants have projected several categories of cost savings that will result from the Transaction, but many of these estimated cost savings are unsubstantiated and reflect speculative assumptions.  Even if the claimed efficiencies were substantiated and achievable, many are not merger-specific.  MDC could achieve many of the claimed cost savings by affiliating with a suitable and interested alternative partner far less harmful to competition.  In any event, Defendants' projected cost savings are not nearly of the magnitude necessary to justify the Transaction in light of its potential to harm competition.

66.     Defendants' other efficiency claims, including those relating to quality improvements, are speculative and unsubstantiated.  The claimed quality efficiencies are also not merger-specific because they could be accomplished absent the Transaction.  Sanford and MDC already are high-quality providers and have presented no evidence demonstrating how the Transaction will improve the quality of care either Defendant provides.  In fact, Sanford already has engaged in efforts to achieve some of these purported quality improvements independent of the Transaction, such as recruiting and retaining specialists and subspecialists as well as launching or expanding service lines.

## IX.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

67.     In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities, using a sliding scale. The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public's interest in effective enforcement of the antitrust laws.

68.     The Commission has reason to believe that the Transaction would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.  In particular, the Commission is likely to succeed in demonstrating, among other things, that:

      a.     The Transaction would have anticompetitive effects in the adult PCP services, pediatric services, OB/GYN services, and general surgery physician services  markets in the Bismarck-Mandan area;

      b.     Substantial and effective entry or expansion into the relevant service and geographic markets is difficult and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Transaction; and

      c.     Any efficiencies that Defendants may assert as resulting from the Transaction are speculative, not merger-specific, and are, in any event, insufficient as a matter of law to justify the Transaction.

69.     Preliminary relief is warranted and necessary.  The Commission voted unanimously to issue an administrative complaint.  Should the Commission rule, after the full administrative trial, that the Transaction is unlawful, reestablishing the *status quo ante* of competition would be difficult, if not impossible, without preliminary injunctive relief from this Court.  The integration of Sanford and MDC's operations, including the elimination or transfer of service lines, the implementation of higher prices, and potential staff reductions, would substantially impair any attempt to restore competition to pre-Transaction levels.

70.     Moreover, in the absence of relief from this Court, substantial harm to competition could occur immediately, including an increase in the costs that employers and their employees in the Bismarck-Mandan area incur for their healthcare and a reduction in the quality of healthcare administered.  Because any potential pro-competitive benefits of the Transaction do

not outweigh the significant interim harm to competition and consumers, and should still be available pending the outcome of the administrative trial, the public equities weigh strongly in favor of Plaintiffs' request for preliminary injunctive relief.

71.     Accordingly, the equitable relief requested here is in the public interest.

WHEREFORE, the Commission and the State of North Dakota respectfully request that the Court:

> a.     Temporarily restrain and preliminarily enjoin Defendants from taking any further steps to consummate the Transaction, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;
>
> b.     Retain jurisdiction and maintain the *status quo* until the administrative proceeding that the Commission has initiated concludes;
>
> c.     Award costs of this action to Plaintiffs, including attorneys' fees to the State of North Dakota; and
>
> d.     Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: June 22, 2017

Of counsel:

ABBOTT B. LIPSKY, JR.
Acting Director
Federal Trade Commission
Bureau of Competition

ALAN DEVLIN
Acting Deputy Director
Federal Trade Commission
Bureau of Competition

CHRISTOPHER CAPUTO
STEPHANIE CUMMINGS
JAMIE FRANCE
MELISSA HILL
LAURA KRACHMAN
ROHAN PAI
NEAL PERLMAN
CATHLEEN WILLIAMS
Attorneys
Federal Trade Commission
Bureau of Competition
Mergers IV Division

Respectfully Submitted,

KEVIN K. HAHM
Deputy Assistant Director
Federal Trade Commission
Bureau of Competition
Mergers IV Division
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3680
Facsimile: (202) 326-2286
khahm@ftc.gov

*Attorney for Plaintiff Federal Trade
Commission*

STATE OF NORTH DAKOTA
Wayne Stenehjem
Attorney General

By:

Parrell D. Grossman, ND ID 04684
Elin S. Alm, ND ID 05924
Assistant Attorneys General
Consumer Protection & Antitrust Division
Office of Attorney General
Gateway Professional Center
1050 E. Interstate Ave., Ste. 200
Bismarck, ND  58503-5574
Telephone (701) 328-5570
Facsimile (701) 328-5568
pgrossman@nd.gov
ealm@nd.gov

*Attorneys for the State of North Dakota*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of June, 2017, I served the foregoing on the following counsel via electronic mail:

Parrell D. Grossman, Esq.
Elin S. Alm, Esq.
Assistant Attorneys General
Consumer Protection & Antitrust Division
Office of the Attorney General
Gateway Professional Center
1050 E. Interstate Ave., Ste. 200
Bismarck, ND 58503-5574
Telephone: (701) 328-5570
Facsimile:  (701) 328-5568
pgrossman@nd.gov
ealm@nd.gov

*Attorneys for Plaintiff State of North Dakota*


Robert M. Cooper, Esq.
Richard A. Feinstein, Esq.
Boies Schiller Flexner LLP
1401 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 237-2727
rcooper@bsfllp.com
rfeinstein@bsfllp.com

*Attorneys for Defendants Sanford Health and Sanford Bismarck*


Timothy Johnson, Esq.
Gray Plant Mooty
500 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 632-3208
timothy.johnson@gpmlaw.com

*Attorney for Defendant Mid Dakota Clinic, P.C.*

Jamie France
Attorney for Plaintiff Federal Trade Commission